**Tagged Opinion**

ORDERED in the Southern District of Florida on _Nov. 24, 2008_



John K. Olson, Judge
United States Bankruptcy Court

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF FLORIDA
## FORT LAUDERDALE DIVISION

In re:

**MILLER ENGINEERING, INC.,**

    Debtors.

_____/

**HENNESSEY CAPITAL SE, LLC,**

    Plaintiff,

v.

**BENNETT L. DAVID III,**
**MARCON MANAGEMENT, INC.,**
**ORIX FINANCIAL SERVICES, INC.,**
**MILLER ENGINEERING, INC.,**

    Defendants.

_____/

Case No. 07-20298-BKC-JKO

Chapter 11

Adv. Pro. 07-01893-BKC-JKO-A

## ORDER ON HENNESSEY CAPITAL SE, LLC'S MOTION FOR SUMMARY JUDGMENT, ORIX FINANCIAL SERVICES, INC.'S MOTION FOR SUMMARY JUDGMENT, AND BENNETT L. DAVID III'S MOTION FOR SUMMARY JUDGMENT

**THIS ADVERSARY PROCEEDING** is before me on cross motions for summary judgment

by three lien creditors, each seeking to establish its priority in the Debtor's assets. The issues presented are highly technical and complex and involve the intersection of Article 9 of the Uniform Commercial Code, Florida judgment lien law, and Florida landlord's lien law. The motions are Hennessey Capital SE, LLC ("Hennessey") Motion For Summary Judgment Upon Adversary Complaint to Determine the Validity, Priority and Extent of Certain Liens in Personal Property (the "Hennessey Motion") [DE 29], Orix Financial Services, Inc's ("Orix") Motion for Summary Judgment (the "Orix Motion") [DE 27] and Bennett L. David III's ("Bennett") Motion for Summary Judgment (the "Bennett Motion") [DE 30].

## JURISDICTION AND VENUE

This is an adversary proceeding to determine the validity, priority, or extent of certain liens on the Debtor's personal property. I have jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334(a) and 157(a). This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(1) and § 157(b)(2)(K). Venue of this proceeding is properly before the Court pursuant to 28 U.S.C. § 1409.

## FACTS

### 1. Procedural history

Miller Engineering, Inc ("Miller") filed its voluntary Chapter 11 petition on November 21, 2007. *See* [DE 1] in the main bankruptcy case. This adversary proceeding was commenced on December 21, 2007. In it, creditor Hennessey asserts that it has a senior perfected pre-petition security interest in a substantial amount of Miller's personal property. *See* Complaint [DE 1]. Orix, a creditor of Miller, filed the Orix Motion [DE 27] on April 24, 2008 and Hennessey filed the Hennessey Motion [DE 29] on April 25, 2008. Bennett, the landlord and creditor of Miller, filed the

Bennett Motion [DE 30] on April 29, 2008.  Pursuant to this Courts briefing orders[1], Orix filed a

Response to the Hennessey Motion and the Bennett Motion (the "Orix Response") [DE 41] on May

21, 2008.  Similarly, Hennessey filed a Response to the Orix Motion and the Bennett Motion (the

"Hennessey Response") [DE 42] on May 21, 2008.  Marcon Management, Inc. ("Marcon"), a

creditor of Miller, filed a response to the three summary judgment motions (the "Marcon Response")

[DE 43] on May 21, 2008.  Likewise, on May 21, 2008, Bennett filed separate Responses to the Orix

Motion [DE 44] and the Hennessey Motion [DE 45] (collectively the "Bennett Response").  On May

30, 2008, the parties submitted a joint stipulation of facts ("Stipulation of Facts") [DE 48], and on

June 5, 2008, Bennett filed separate replies to the Hennessey Response [DE 51] and to the Marcon

Response [DE 52].  On June 11, 2008, the Court conducted oral arguments on the Orix Motion, the

Hennessey Motion, and the Bennett Motion.

### 2.  Findings of fact

### a.  Landlord's lien

On or about April 29, 1998, Bennett and Miller entered into a commercial lease agreement,

the purpose of which was to outline the terms pursuant to which Bennett would lease to Miller the

real property located at 1943 W. McNab Road, Pompano Beach, Florida 33069 (the "Commercial

Space").  *See* Exhibit "3" attached to [DE 1]; *See also* Stipulation of Facts *at* ¶ 1.  The Lease was

for a term of three years and expired on April 30, 2001.  *See* Exhibit "3" attached to [DE 1].  Miller

and Bennett made specific hand written changes to the form language in the lease and signified their

approval by initialing each change.  *Id.*  The relevant changes agreed to by Miller and Bennett

crossed out and effectively deleted paragraphs nine, ten and eleven of the lease.  Paragraph 9

---

[1]*See* [DE 31] and [DE 39].

provided:

> NINTH: The said lessee [Miller] hereby pledges and assigns to the lessor [Bennett] all the furniture, fixtures, goods and chattels of said lease, which shall or may be brought or put on said premises as security for the payment of the rent herein reserved and the lessee [Miller] agrees that the said lien may be enforced by distress foreclosure or otherwise at the election of the said lessor [Bennett], and does hereby agree to pay attorney's fees of ten percent of the amount so collected or found to be due, together with all costs and charges therefore incurred or paid by the lessor [Bennett].

*Id. at* p. 2. Bennett contends that the, "crossing out of these provisions was in no way intended as a waiver of my right to a landlord's lien," instead, "I agreed to allow state law to fill the gap and control the issue of a landlord's lien . . ." *See* "Affidavit of Bennett L. David in Support of Motion for Summary Judgment" attached to the Bennett Motion *at* ¶ 6. Paragraph "EIGHT" of the commercial lease provides that "the lessee agrees that he will pay all charges for rent . . .and should said charges for rent . . . have become due, the lessor may . . .consider the said lessee tenant at sufferance and the entire rent for the rental period then next ensuring shall at once be due and payable and may forthwith be collected by distress or otherwise." Exhibit "3" attached to [DE 1] *at* p. 2. Further this commercial lease permits the tenant, "an option to renew this lease for two additional terms of one year each beginning at the end of the original lease term on the same terms and conditions as during the original three year lease term . . ." *Id. at* p. 6.

### b. Orix purchase money security interest

On October 10, 2000, Maruka USA, Inc. ("Maruka"), filed a UCC Financing Statement with the Florida Secured Transaction Registry ("FSTR"), perfecting a security interest in a Mori-Seiki SL-153SY 5-axis lathe w/bar feed, Latham Hi-Pressure Pump, 4,000 rpm, 15 HP option, 9 Live Tools, Parts Catcher & Fanuc 181 Control S/N: 1424 (the "Lathe"). *See* Stipulation of Facts *at* ¶ 2; *See also* "Security Agreement" attached to Initial Disclosure [DE 11]. Part of this transaction included a

-4-

landlord's lien waiver as to the Lathe executed between Bennett and Maruka. *See* "Landlord and/or Mortgagee Waiver " attached to Initial Disclosure [DE 11].

On December 4, 2000, Orix filed a UCC-3 with the FSTR reflecting the assignment of the security interest from Maruka to Orix. *See* Exhibits "7" & "8" attached to [DE 1]; *See also* Stipulation of Facts *at* ¶ 2; "Without Recourse Sellers Assignment" attached to Initial Disclosure [DE 11]. Landlord Bennett expressly subordinated its lien to Orix's lien in the Lathe. *See* Bennett Reply to the Hennessey Response [DE 51] *at* p. 3; Bennett Reply to Marcon Response [DE 52] *at* p. 3; "Landlord and/or Mortgagee Waiver " attached to Initial Disclosure [DE 11].

### c. Lease changes

After the expiration of the Lease in May 2001, Bennett and Miller agreed to continue the lease agreement. *See* "Affidavit of Bennett L. David in Support of Motion for Summary Judgment" attached to the Bennett Motion *at* ¶ 4; "Deposition of Jim Miller" attached to the Bennett Motion *at* pg. 144, ¶¶ 1-22; *see also* Complaint [DE #1] *at* ¶ 24. According to Miller's President and Chief Operating Officer, Jim Miller, Miller agreed to an oral one year extension of the lease, utilizing the option provisions in the original lease agreement. "Deposition of Jim Miller" attached to the Bennett Motion *at* pg. 144, ¶¶ 1-22.

At some point after the extension of the lease, Miller defaulted. On April 13, 2004, Bennett received a Default Judgment for Eviction against the Debtor. *See* Complaint [DE #1] *at* ¶ 25. Bennett states that the "eviction proceedings were voided by the parties after orally renewing their Lease on a month-to-month basis." Affirmative Defenses [DE 10] at ¶ 1(E). On March 8, 2005, Bennett and Miller entered into an agreement resuming the commercial lease on a month to month basis. *See* Exhibit "1" attached to [DE 43]. This agreement states in relevant part:

Bennett David, LANDLORD, agrees upon payment of December 2004, and January, February and March of 2005 Lease payments of $4,017.54, plus Sheriff's and Locksmith Fees from February 2005 Eviction notice for missed December 2004 and missed January 2005 payments, that MILLER ENGINEERING INC, TENANT, will be free and clear of operational control of said PREMISES located at 1943 W. McNab, Pompano Beach, FL 33069, with no Landlord Liens that may have previously been filed affecting any facet of lawful operation, in accordance to all previous use of said premises.

This specifically releases for any third party's investment in MILLER ENGINEERING INC, the right for MILLER ENGINEERING INC to sell equity in the company, sell assets of inventory or equipment, or any other financial transaction, except removal of any fixed investments that have been made to the premises of 1943 W McNab, such as air conditioning, doors, power upgrades, and the like.

This agreement does not waive previous debts owed from prior rent arrears. ~~which will still be resolved by separate instrument between Bennett David and MILLER ENGINEERING~~. Total due is $16,378.49. If payment of sum due is not paid by March 12, 2005 this agreement is void. This is a month to month lease with rent due the 1st day of each month. Tenant to provide liability insurance certificate by March 16, 2005, $1,000,000 minimum.

*Id.* Bennett contends that the resumption of lease agreement was not valid because Miller "failed to obtain liability insurance of $1,000,000 by March 16, 2005." Affirmative Defenses [DE 10] at ¶ 1(E), n3. In addition, Bennett states that, "the document (resumption of lease agreement) was in no way intended to be a waiver of my landlord's lien rights." *See* "Affidavit of Bennett L. David in Support of Motion for Summary Judgment" attached to the Bennett Motion *at* ¶ 8.

### d. Hennessey's security interest

On or about May 23, 2005, Miller executed a promissory note and security agreement in favor of Hennessey. *See* Exhibit "1" attached to [DE 1]; *See also* Stipulation of Facts *at* ¶ 3. Pursuant to this agreement, Hennessey was granted a security interest in the following items of collateral:

(a) 1 - 1194 Kitamura Mycenter 3 CNC Milling machine w/4th axis, Fanuc OMC S/N: 20887;
(b) 1 - 1994 Kitamura Mycenter 3/APC CNC Milling machine w/4th axis, Fanuc OMC S/N:

20891;

**(c)** 1 - 2001 Mori-Seiki SL-153SY 5-axis lathe w/bar feed, Latham Hi-Pressure Pump, 4,000 rpm, 15 HP option, 9 Live Tools, Parts Catcher & Fanuc 181 Control S/N: 1424;[2]

**(d)** 2 - 1999 Sharp 42" manual milling machines S/N: 60924183;

**(e)** 2 - 1999 Sharp 50" manual milling machines S/N: 70102814;

**(f)** 1 - 1992 Colchester (English) Engine Lathe S/N: VT50GIRJV04216;

**(g)** 1 - 2001 Faro 5-axis "Gold" series Coordinate Measuring Arm; software & laptop S/N: G08050001830;

**(h)** 1 - 2002 Optical Gauging Inspection System S/N: BB08051263;

**(i)** 1 - 1995 Roto-Finish Industrial Deburring machine S/N: ER0405C-96- A25 with 100 cmf Dryer S/N: D321-103-9711-56N;

**(j)** 1 - 1999 Saylor-Beale 20 HP Air Compressor S/N: 9Y-5-M98;

**(k)** 1 - 1991 Clark Fork Lift w/side shift S/N: GX230 0226 8385 KOP;

**(l)** 1 - 2000 Cosen 10" Automatic Band Saw S/N: C8781224;

**(m)** 1 - 2001 Sunnen MBB1660K Honing machine;

**(n)** 60 Assorted CAT-30 Tool Holders; various dimensions and mot new or like new; and

**(o)** All inventory, other equipment of Miller Engineering and chattel paper, instruments and promissory notes, documents and intangibles.

(the "Hennessey Collateral"). *See* Complaint [DE #1] *at* ¶ 12. On or about May 25, 2005, Hennessey filed a UCC-1 Financing Statement. *See* Exhibit "2" attached to [DE 1]; *See also* Stipulation of Facts *at* ¶ 4. Accordingly, Hennessey holds a duly perfected security interest in the Hennessey Collateral and such security interest was perfected as of May 25, 2005.

### e. Subsequent events

On October 10, 2005, Orix's UCC filing statement lapsed. *See* Stipulation of Facts *at* ¶ 5. On August 2, 2006, Orix filed a new UCC-1 Financing Statement with the FSTR. *See* Exhibit "8" attached to [DE 1]; *See also* Stipulation of Facts *at* ¶ 6. Accordingly, Orix holds a duly perfected security interest in the Lathe.

Miller and Marcon reached a settlement pursuant to which Marcon would be entitled to final judgment against Miller in the event Miller defaulted on its obligation under Settlement Agreement.

---

[2]This is the same lathe which is subject to Orix's purchase money security interest described above.

*See* Stipulation of Facts *at* ¶ 16.  Miller defaulted under the Settlement Agreement with Marcon and on September 1, 2006, Marcon obtained a Final Judgment against Miller in the amount of $24,000. *See* Exhibit "10" attached to [DE 1]; *See also* Stipulation of Facts *at* ¶ 7.  On November 15, 2006, Marcon obtained a Writ of Execution to enforce its Final Judgment and levy against the assets at Miller's business. *See* Stipulation of Facts *at* ¶ 8.  On December 13, 2006, Marcon filed a Judgment Lien Certificate with the Office of the Secretary of State. *See* Stipulation of Facts *at* ¶ 9.  On July 16, 2007, Marcon filed an amended Judgment Lien Certificate with the Office of the Secretary of State. *See* Stipulation of Facts *at* ¶ 10.  On October 25, 2007, Marcon caused the Deputy Sheriff of Broward County to levy on a Piper fixed wing, single engine aircraft, model # PA-28RT-201T. *See* Stipulation of Facts *at* ¶ 11.

On October 26, 2006, a Default Final Judgment of Eviction was entered by the Circuit Court of the Seventeenth Judicial Circuit, in and for Broward County, Florida, effectively ending the lease relationship between Bennett and Miller. *See Bennett David v. Miller Engineering, Inc.*, Case No. SO06-9765-60 (Fla. Broward County Ct. 2006); *See also* Exhibit "4" attached to [DE 1]; *See also* Stipulation of Facts *at* ¶ 17.  Bennett after being granted this relief, " . . . took back possession of the premises." "Affidavit of Bennett L. David in Support of Motion for Summary Judgment" attached to the Bennett Motion *at* ¶ 5.

On October 29, 2007, Orix obtained a Final Default Judgment against the Debtor in the amount of $126,648.83.  *See* Exhibit "9" attached to [DE 1]; *See also* Stipulation of Facts *at* ¶ 12. On November 20, 2007, Orix filed a Judgment Lien Certificate with the Florida Secretary of State reflecting the judgment in the amount of $126,648.83.  *See* Stipulation of Facts at ¶ 13.

## DISCUSSION

### 1. Legal standard for summary judgment

Under Rule 56 of the Federal Rules of Civil Procedure, incorporated into bankruptcy proceedings by Rule 7056 of the Federal Rules of Bankruptcy Procedure, summary judgment is proper if the pleadings, deposition, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material facts that the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The moving party bears the initial burden of showing the Court that there are no genuine issues of material fact that should be decided at trial. *Jeffery v. Sarasota White Sox*, 64 F.3d 590, 593-94 (11th Cir. 1995); *Clark v. Coats & Clark, Inc.*, 929 F.2d 604 (11th Cir. 1991). The Supreme Court explained in *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970), that when assessing whether the movant has met this burden, the court should view the evidence and all factual inferences in the light most favorable to the party opposing the motion and resolve all reasonable doubts in that party's favor. See also *Samples on behalf of Samples v. City of Atlanta*, 846 F.2d 1328, 1330 (11th Cir.1988). The Eleventh Circuit has explained the reasonableness standard:

> In deciding whether an inference is reasonable, the Court must "cull the universe of possible inferences from the facts established by weighing each against the abstract standard of reasonableness." The opposing party's inferences need not be more probable than those inferences in favor of the movant to create a factual dispute, so long as they reasonably may be drawn from the facts. When more than one inference reasonably can be drawn, it is for the trier of fact to determine the proper one.

*WSB-TV v. Lee*, 842 F.2d 1266, 1270 (11th Cir.1988)(internal citations omitted). A moving party discharges its burden on a motion for summary judgment by "showing" or "pointing out" to the Court that there is an absence of evidence to support the non-moving party's case. *Celotex*, 477 U.S.

-9-

at 325.

The party opposing the motion for summary judgment may not simply rest upon mere allegations or denials of the pleadings; after the moving party has met its burden of coming forward with proof of the absence of any genuine issue of material fact, the non-moving party must make a sufficient showing to establish the existence of an essential element to that party's case, and on which that party will bear the burden of proof at trial. *Celotex Corp.,* 477 U.S. at 324.; *Poole v. Country Club of Columbus, Inc.*, 129 F.3d 551, 553 (11th Cir. 1997). If the record presents factual issues, the court must not decide them; it must deny the motion and proceed to trial. *Environmental Defense Fund v. Marsh*, 651 F.2d 983, 991 (5th Cir. 1981).[3] By its very terms the standard for summary judgment provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). A dispute about a material fact is "genuine" if the "evidence is such that a reasonable [finder of fact] could return a verdict for the nonmoving party." *Id.* at 248. As there is no genuine issue as to the material facts this matter is ripe for adjudication as a matter of law.

### 2. Validity, extent and priority of liens

At the outset, I take judicial notice of the following concessions by various parties: (a) Marcon's admission that Hennessey as a matter of law has priority over its judgment lien interest, *see* Marcon Response *at* ¶ 6; (b) Marcon's admission that Orix as a matter of law has priority over its judgment lien as to the Lathe, *see* Marcon Response *at* ¶ 5; and (c) Bennett's admission that Orix

---

[3]Fifth Circuit Decisions entered before October 1, 1981, are binding precedent in the Eleventh Circuit. *See Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981).

as a matter of law has priority over its landlord lien as to the Lathe, *see* Bennett Response to the Orix

Motion [DE 44] *at* ¶ 9.

### i. Hennessey and Orix

Hennessey has priority over Orix's secured interest in the Lathe. Orix's UCC filing statement

lapsed on October 10, 2005. Fla. Stat. § 679.515 provides for the duration and effectiveness of

financing statements and the effect a lapse in a financing statement has on the priority of secured

interests. This section states in relevant part:

> . . . Upon lapse, a financing statement ceases to be effective and any security interest or
> agricultural lien that was perfected by the financing statement becomes unperfected, unless
> the security interest is perfected without filing. If the security interest or agricultural lien
> becomes unperfected upon lapse, it is deemed never to have been perfected as against a
> purchaser of the collateral for value.

Fla. Stat. § 679.515(3) (2008). As Orix's interest was not "perfected without filing"[4] and

Hennessey's secured interest was perfected prior to the lapse in Orix's filing statement, Hennessey's

secured interest in the Lathe is superior to Orix's interest in this collateral. Orix does hold a

perfected security interest in the Lathe junior to Hennessey's security interest.

### ii. Bennett's landlord's lien

The record demonstrates that from 1998 thru 2006 Miller leased commercial space from

landlord Bennett. Because (as discussed below) the issue of whether the lease was continuous or not

is critical under Florida law in determining whether the landlord's lien is superior to the Hennessey

and Marcon liens, I must analyze whether as a matter of law Miller and Bennett interacted under one

continuous lease over the approximately eight year period, or given the intervening circumstances,

whether the continued interaction of the two resulted in a new lease agreement. In addition, I must

---

[4]*See* Fla. Stat. § 679.3131

decide, as a matter of law, if Bennett waived his right to a landlord's lien with respect to Hennessey

and Marcon.

The creation and perfection of liens are fundamentally questions of state law. *Weed v.*

*Washington* (*In re Washington*), 242 F.3d 1320, 1322-23 (11th Cir. 2001); *Grant v. Kaufman, P.A.*

(*In re Hagen*), 922 F.2d 742, 744 n.2 (11th Cir. 1991)(*citing Matter of Fitterer Eng'g Assoc., Inc.*,

27 B.R. 878, 880 (Bankr. E.D. Mich. 1983)).  Florida Statute section 83.08 governs the creation of

a landlord's lien for rent due and owing.  Section 83.08 states:

> Every person to whom rent may be due, the person's heirs, executors, administrators or
> assigns, shall have a lien for such rent upon the property found upon or off the premises
> leased or rented, and in the possession of any person, as follows:
>
>> (1) Upon agricultural products raised on the land leased or rented for the current year.
>> This lien shall be superior to all other liens, though of older date.
>
>> (2) Upon all other property of the lessee or his or her sublessee or assigns, usually
>> kept on the premises. This lien shall be superior to any lien acquired subsequent to
>> the bringing of the property on the premises leased.
>
>> (3) Upon all other property of the defendant. This lien shall date from the levy of the
>> distress warrant hereinafter provided.

Fla. Stat. § 83.08 (2008).  Further, a landlord's statutory lien need not be filed or recorded to be

perfected[5]; rather, it attaches at the commencement of tenancy or as soon as the chattel is brought

onto the premises, and is superior to a subsequently created chattel lien.  *Beason-Simmons v. Avion*

*Technologies Inc.* 662 So.2d 1317, 1318 (4th DCA 1995) (*citing  Lovett v. Lee*, 141 Fla. 395

---

[5]Historically, a landlord's lien, "did not have to be recorded in order to have priority over
a subsequently acquired security interest or lien." *Mathias v. Walling Enter., Inc.*, 609 So. 2d
1323, 1326 (Fla. 5th DCA 1992)(en banc), *affirmed*, 636 So. 2d 1294 (Fla. 1994).  Article 9 of
the Florida Uniform Commercial Code, which covers secured transactions, continues to
recognize this historic exception. *See* Fla. Stat. § 679.1091 (2008); *see also Flanigan's Enter. v.
Barnett Bank*, 639 So. 2d 617, 619 n.2 (Fla. 1994) (finding that Chapter 679 of the Florida
Statutes by its own terms does not apply to landlords' liens).

(Fla.1940)); *see also Fla. E. Coast Properties, Inc. v. Best Contract Furnishings, Inc.*, 593 So.2d 560, 562, n. 6 (Fla. 3d DCA 1992), *United States v. S.K.A. Assoc., Inc.*, 600 F. 2d 513, 515 (5th Cir. 1979)[6] (construing Florida law). Thus, a landlord's lien is superior even when the rent default occurs after an intervening lien has been perfected. *Lovett*, 141 Fla. at 405-06. However, a "landlord's lien is not superior to a lien acquired by another prior to the bringing of the property upon the leased premises, or prior to the commencement of the tenancy under the lease." *Ruge v. Webb Press Co.*, 71 Fla. 536, 544 (1916).

The existence of a landlord's lien is not permanent. As stated by the Florida Third District Court of Appeal:

> Nowhere in the statute does it indicate that the superiority of a landlord's lien over a subsequent lienholder continues *after* the lease period has ended, the lease's terms and conditions fulfilled, and a new lease is entered into between the same landlord and the same tenant. . .
>
> We hold that when the commencement of a tenancy, based upon a lease, creates a statutory landlord's lien, pursuant to section 83.08, Florida Statutes, such lien is viable only as long as the underlying lease exists. Once the tenant's obligations have been met under the lease, the landlord's lien is extinguished and any other inferior liens may ripen to a priority superior to a landlord's lien, which may come to fruition by virtue of the existence of a new lease. . .

*Flowers v. Centrust Savings Bank*, 556 So. 2d 1123, 1125 (Fla. 3d DCA 1989); *see also Robie v. Port Douglas, Inc.*, 662 So. 2d 1389, 1391 (Fla. 4th DCA 1995). The mere fact that the same parties enter into a new lease on the same premises does not affect the analysis of the existence of a landlord's lien, as "the operative inquiry is whether landlord and tenant continued their relationship under the initial lease either through an extension, a renewal or an option." *Robie*, 662 So. 2d *at* 1391 (internal citations omitted). Thus, I must look to the nature of the continued relationship between

---

[6]Binding as precedent under *Bonner, supra*, n3.

the landlord and the tenant – *i.e.,* are the parties operating under the initial lease, did they renew the initial lease, did the tenant exercise an option under the initial lease, or did the tenant fail to fulfill the terms and conditions of the initial lease, such that the tenancy should be treated as a new lease. *Flowers*, 556 So. 2d *at* 1125.

Florida case law provides insight as to the facts that would constitute a legal termination of a lease, which would extinguish the landlord's lien right arising under the original lease and would create a new right after the landlord and tenant enter into a new agreement. On the other hand, Florida case law also provides for circumstances in which continued occupancy in light of intervening events legally constitutes "arising under the same transaction," thus preserving the lien created under the original lease. In the latter case, the parties are still controlled by the provisions of the original lease agreement.

In *Robie, supra,* the original tenant in a leased premises assigned the lease to a new tenant and the original tenant took a security interest in all of the furnishings, furniture and equipment located at the premises in question. 662 So. 2d *at* 1390. After perfection of that security interest, the landlord and new tenant executed a lease termination agreement, which effectively released one another from possible claims. *Id.* On that same day, the landlord and new tenant entered into a new lease agreement. *Id.* It should be noted that at the time of this transaction, the new tenant was current in its lease payments. *Id.* The Court held that the original tenant's security interest was superior to the landlord's statutory lien because the landlord and new tenant terminated the original lease prior to any default on the lease obligations and entered into a new lease after the original tenant's security interest was perfected. *Id.* By contrast, in *Sachs v. Curry-Thomas Hardware, Inc.*, the Florida First District Court of Appeal found that the mere substitution of tenants under a lease

-14-

does not extinguish a landlord's lien as there existed at all times a tenancy based on a lease, under which the landlord was capable of initiating an action for unpaid rent. 464 So. 2d 597, 600-601 (Fla. 1st DCA 1985).

In the case before me, at the time the original lease expired in 2001, Miller continued to lease the Commercial Space. Whether Miller elected to use the option prescribed in the original commercial lease or the parties continued their dealings under a more informal month-to-month arrangement is irrelevant under Florida law: under either scenario, the landlord's lien arising under the original lease continued unbroken because the parties intended to continue their prior landlord-tenant relationship. This conclusion is supported by the fact that the amount of rent due changed with Miller's continued occupancy under the same terms as the original lease: the new rent was calculated using the provisions provided for in the option portion of the original lease. In addition, nothing on the record shows that Miller had defaulted on its obligations under the original lease at the point the term of the lease ended in 2001. The parties never executed a termination of the lease in conjunction with the implementation of a new lease agreement. Instead the status quo essentially remained in effect. This is true even after the option period had lapsed – *i.e.,* notwithstanding the fact that the original lease did not permit the tenant an option to extend the lease past April of 2003, for all intents and purposes the continued conduct of Miller and Bennett demonstrates an *ipso facto* renewal or extension of the original lease. Bennett was always capable of pursuing relief for unpaid rent if Miller failed to satisfy its rent obligations. Thus, as a matter of Florida law, Miller's continued use of the Commercial Space on a month-to-month basis was done under the authority of the original lease, at least up until its default in the payment of rent in 2004. I conclude that a continued lease agreement which occurs on a periodic tenancy does not result in a termination of the

-15-

prior period agreement and creation of a new lease agreement at the beginning of each week, month, or year. Were the analysis to stop at that point, I would conclude that Bennett's landlord's lien was superior to the Hennessey blanket lien and the Marcon judgment lien.

This issue becomes more complex in light of Miller's subsequent default on its rent obligations, which resulted in Bennett pursuing eviction proceedings and constructively taking possession of the property. In settlement of this dispute, Bennett and Miller entered into a new agreement for the lease of the Commercial Space after Bennett took affirmative steps to remove Miller from possession. The resumption agreement was conditioned on full payment of past due rent and included concessions by Bennett.

In an effort to argue that the March 2005 agreement for the resumption of lease is null and void, Bennett points to the fact that Miller never obtained liability insurance as required under the terms of that agreement. Bennett argues from this failure that the March 2005 agreement is nugatory and that the relationship between landlord and tenant should be viewed as continuing under the original 1998 lease.[7] Unfortunately for Bennett, I conclude that its argument is illusory. The March 2005 agreement does provide that the tenant is required to provide insurance. But the mere fact that no insurance was provided does not nullify the agreement. It may well constitute a breach of the agreement, but it is critical to note that the parties continued to interact in a landlord-tenant relationship for more than a year and a half after executing the resumption of the lease.[8]

---

[7]And thus, Bennett argues, its landlord's lien reaches back to the original lease date of 1998, priming the intervening claims of Hennessey and Marcon.

[8]The resumption of lease was executed in March of 2005 and the Final Judgment of Eviction was entered on October of 2006. Miller was a tenant for the intervening period. Miller's failure to obtain the liability insurance, if a breach, was apparently waived; that failure was, in any event, not cited by Bennett as a basis for lease termination during the interim.

Bennett's actions in obtaining a judgment for eviction in April 2004 following Miller's rent default effectively terminated the original lease agreement. I conclude as a matter of law that the renewed occupancy from the execution of the new lease in March 2005 was pursuant to a new lease under Florida law. As a result, the landlord's lien rights arising from 1998 were extinguished in 2004 and new landlord's lien rights arose as of March 8, 2005.

Hennessey's blanket security interest arose from the security agreement executed May 23, 2005, and perfected May 25, 2005. It is thus subordinate to the new landlord's lien which arose under Florida law in March 2005 unless that landlord's lien was waived.

Marcon's judgment lien constituted a lien on the Debtor's assets upon the registry of the judgment lien certificate with the Secretary of State on December 13, 2006, amended July 16, 2007. Thus, Marcon's lien in the Debtor's personal property is subordinate both to Hennessey's blanket security interest (as to the items of collateral described in that security interest) and to Bennett's landlord's lien, again unless the landlord's lien was waived.[9]

### iii. Waiver of landlord's lien

As Marcon's and Hennessey's rights are subordinate to Bennett's landlord's lien absent a waiver, I must determine whether Bennett waived his landlord lien rights. A landlord may waive his right to a landlord's lien with respect to any property placed on the leased premises. However, "without specific acts of . . . [a] landlord agreeing to subordinate his lien to that of [a] chattel mortgage, he continues to possess a priority of lien over that of . . . [a] chattel mortgagee," where, as here, the lease was entered into prior to the perfection of the chattel mortgagee's security interest.

---

[9]Because of the curious lapse in Orix's purchase money security interest, its priority status will be separately discussed; *see* below.

*Geiger Mut. Agency, Inc. v. Wright*, 233 So. 2d 444, 446 (Fla. 4th DCA 1970).

A waiver is generally characterized as "the intentional relinquishment of a known right,"

*Dooley v. Weil* (*In re Garfinkle*), 672 F.2d 1340, 1347 (11th Cir. 1982); *see also Fireman's Fund Ins.*

*Co. v. Vogel*, 195 So.2d 20 (Fla.2d DCA 1967); *Gilman v. Butzloff*, 155 Fla. 888 (1945); *Rader v.*

*Prather*, 100 Fla. 591 (1930). Under Florida law a waiver requires (1) the existence at the time of

waiver of a right, privilege, advantage or benefit which may be waived; (2) the actual or constructive

knowledge thereof; and (3) an intention to relinquish such right, privilege, advantage or benefit.

*Zurstrassen v. Stonier*, 786 So. 2d 65, 70 (Fla. 4th DCA 2001). A waiver may be express or implied

from conduct. *Dooley*, 672 F.2d *at* 1347. When a waiver is implied from conduct, the acts, conduct,

or circumstances relied upon to show waiver must make out a clear case demonstrated by clear

evidence. *Id.*; *see also Vogel*, 195 So. 2d at 24; *American Somax Ventures v. Touma*, 547 So. 2d

1266, 1268 (Fla. 4th DCA 1989). Generally "questions of waiver . . . typically involve fact issues

inappropriate for summary judgment . . . ." *Woodruff v. Government Employees Ins. Co.*, 669 So.

2d 1114, 1115 (Fla. 1st DCA 1996) (citing *Mutual of Omaha Ins. Co. v. Eakins*, 337 So. 2d 418 (Fla.

2d DCA 1976); *Six L's Packing Co., Inc. v. Florida Farm Bureau Mut. Ins*. Co., 268 So. 2d 560 (Fla.

4th DCA 1972)); see also *Goodwin v. Blu Murray Ins. Agency, Inc.*, 939 So. 2d 1098, 1104 (Fla. 5th

DCA 2006). The burden of proving a waiver of a right rests upon the party invoking it. *Mercede v.*

*Mercede Park Italian Restaurant, Inc.*, 392 So. 2d 997, 998 (Fla. 4th DCA 1981); *State v. Hadden*,

370 So.2d 849 (Fla. 3rdDCA 1979).

It is well established under Florida law that parol evidence, testimony given to demonstrate

the intent of a party as to provisions in a contract, is inadmissible to vary or contradict the clear and

unambiguous language of a contract. *Vencor Hosps. v. Blue Cross Blue Shield of R.I.*, 284 F.3d

1174, 1179 -1180 (11th Cir. 2002) (interpreting Florida law); *see also J.M. Montgomery Roofing Co. v. Fred Howland, Inc.*, 98 So. 2d 484, 485-86 (Fla. 1957). Courts may "consider extrinsic evidence only when confronting an ambiguous contract provision, and courts are barred from using evidence to create an ambiguity to rewrite a contractual provision[.]" *J.C. Penney Co., Inc. v. Koff*, 345 So. 2d 732, 735 (Fla. 4th DCA 1977) (cited with approval in *Uransky v. First Federal Savings & Loan Ass'n of Fort Myers*, 684 F.2d 750, 754 (11th Cir. 1982)).

### A. Waiver of landlord's lien under original lease

I look first to the original commercial lease to see if there was an affirmative waiver by Bennett of his statutory landlord's lien right. A statutory right exists absent a contract, thus, if a contract is silent as to the existence of a landlord's lien right, that right still exists and may be enforced by the landlord. If I conclude that there is no ambiguity as to the original lease agreement – *i.e.,* reading the contract in its current form without paragraphs nine, ten, and eleven – then I would necessarily conclude that no affirmative waiver of the landlord's statutory lien right occurred.

On the other hand, if I find ambiguity as to the intentions of the parties with regard to the action of deleting the ninth paragraph of the original commercial lease, then I need to discern what was meant by that deletion. No evidence has been provided by Hennessey or Marcon to establish Bennett's intent to waive his lien rights. As explained above, the burden rests squarely with Hennessey and Marcon. Bennett provides an affidavit which states that there was never an intention to waive his landlord's lien rights. Bennett further contends that this assertion is evidenced by the fact that a right to rent through distress is afforded under paragraph eight of the original commercial lease. It would, of course, make little sense for the retention of a distress for rent remedy if Bennett intended to waive his landlord's lien rights. The Bennett Motion thus contends that there was no

-19-

waiver as a matter of law.

### B. Waiver of landlord's lien in new lease

I need not draw a conclusion as to whether there is an ambiguity or not as to the parties'

intentions with regard to the original commercial lease since a subsequent affirmative waiver by

Bennett is sufficient to resolve the issues raised in this adversary proceeding.

Bennett affirmatively waived his landlord's lien rights with regard to third party security

interests in Miller's chattel property arising after the execution of the resumption of lease. As stated

in the March 2005 agreement:

> This specifically releases for any third party's investment in MILLER
> ENGINEERING INC, the right for MILLER ENGINEERING INC to sell equity in
> the company, sell assets of inventory or equipment, or any other financial transaction,
> except removal of any fixed investments that have been made to the premises at 1943
> W McNab, such as air conditioning, doors, power upgrades, and the like.

There is no ambiguity in this provision. Bennett had the right to a landlord's lien at the time he

waived that right, legally knew of such right (evidenced by the discussion of a landlord's lien in the

resumption of the lease agreement), and affirmatively waived such right, thus satisfying the

requirements under Florida law for waiving a landlord's lien right.

As explained above, the argument that this agreement is void because Miller failed to obtain

required insurance is erroneous. Although the failure to obtain insurance did provide Miller a right

to declare a breach of the new lease, the failure to obtain insurance does not automatically result in

the lease terminating. Bennett did nothing to terminate the new lease until October 2006, well after

the perfection of Hennessey's consensual blanket security interest and the perfection of Marcon's

judgment lien. To the contrary, Bennett permitted Miller to occupy the Commercial Space under

this lease agreement for more than a year and a half. Bennett's contention in his affidavit to support

-20-

the assertion that he never intended to relieve himself of his landlord lien rights seeks to contradict the clear and unambiguous language of the March 2005 lease agreement and, as such, is inadmissible parol evidence.

Finally, Bennett's contention that Hennessey was not an intended beneficiary of the lease and "therefore cannot attempt to enforce its terms" is misguided. The landlord's lien waiver was entered into to permit Miller to obtain credit free and clear of the possible attachment of a superior landlord's lien so as to induce lenders to extend credit to Miller – and in the absence of such a waiver, Miller's ability to obtain such credit would almost certainly have been constrained. Hennessey is not trying to enforce the terms of the lease. Instead, it is rightly claiming that Miller, a beneficiary to the lease agreement, entered into a secured transaction with Hennessey in which those waiver provisions were in full force and effect at the time of the agreement, thus subordinating the landlord's lien claimed by Bennett.

### iv. Competing lien claims and the doctrine of marshaling

I am confronted here with four competing interests that all have secured interest in varying pieces of collateral owned by Miller. Hennessey claims a secured interest in the Hennessy Collateral for $112,912.99. *See* Claim 14 filed in the main bankruptcy case.[10] Orix claims a secured interest in the Lathe for $126,648.83. *See* Claim 11 filed in the main bankruptcy case. Marcon claims a judgment lien interest in Miller's property for $44,010.68. *See* Claim 1 filed in the main bankruptcy case. Bennett claims a landlord's lien in Miller's property for $117,243.37. *See* Claim 2 filed in the main bankruptcy case. Marcon's interest in the Lathe is junior to Orix's interest in the Lathe because Orix's lien dates to the filing of its renewed UCC-1 financing statement on August 2, 2006.

---

[10]This claim amends Claim 12 filed by Hennessey.

Marcon's judgment lien dates to the filing of its judgment lien certificate on December 13, 2006, amended July 16, 2007. Bennett's interest in the Lathe is junior to Orix's interest in the Lathe by virtue of an express subordination to Orix's lien. Marcon and Bennett hold secured interests in the balance of Miller's personalty.

Orix argues Hennessey's claims are subject to the doctrine of marshaling, which "rests upon the principle that a creditor having two funds to satisfy his debt, may not by his application of them to his demand, defeat another creditor, who may resort to only one of the funds." *Meyer v. United States*, 375 U.S. 233, 236 (1963)(quoting *Sowell v. Fed. Reserve Bank*, 268 U.S. 449, 456-57 (1925)). The Supreme Court in *Meyer* discussed the extent and fundamental function of the doctrine of marshaling:

> In considering the relevance of the doctrine here it is well to remember that marshaling is not bottomed on the law of contracts or liens. It is founded instead in equity, being designed to promote fair dealing and justice. Its purpose is to prevent the arbitrary action of a senior lienor from destroying the rights of a junior lienor or a creditor having less security. It deals with the rights of all who have an interest in the property involved and is applied only when it can be equitably fashioned as to all of the parties.

375 U.S. at 237. Bankruptcy courts have the equitable power to order the marshaling of assets in a bankruptcy case or proceeding. *In re Larry's Equip. Serv., Inc.*, 23 B.R. 132, 133 (Bankr. D. Me. 1982).

Three main elements must be present in order to invoke the marshaling doctrine: (1) two or more creditors with a common debtor; (2) two funds belonging to the debtor; and (3) one creditor has legal right to satisfy his demands from both funds, while the other may go after only one. *SAC Constr. Co. v. Eagle Nat'l Bank of Miami*, 449 So. 2d 301, 303 (Fla. 3d DCA 1984) (*citing State Bank of Florida v. Roche*, 35 Fla. 357 (1895)); *see also Emerald Hills Country Club, Inc. v.*

*Hollywood, Inc.*, 32 B.R. 408, 421-22 (S.D. Fla. 1983); *In re Talmo*, 192 B.R. 272, 275 (Bankr. S.D. Fla. 1996); *In re Beach*, 169 B.R. 201, 204 (D. Kan. 1994). Chief Judge Lewis M. Killian, Jr., in *In re Hale*, provided two other factors that need to be considered in the marshaling analysis, which are: (1) that there is no impairment of the senior creditor's right to complete satisfaction; and (2) an absence of injustice to third persons. 141 B.R. 225, 226 (N.D. Fla. 1992) (internal citations omitted).

The right to marshaling is merely an equitable remedy and is not a lien. Accordingly, "it is subject to displacement and defeat by subsequently acquired liens upon the funds" at issue. *John Norton Pomeroy, Jr., Pomeroy's Equity Jurisprudence § 2290* (2nd ed. 1919); *Gilliam v. McCormack,* 85 Tenn. 597, 4 S.W. 521, 1 Pickle 587 (1886).

In the absence of contrary direction from the Florida courts or legislature, as a general principle a party with interests inferior to that of the junior lienholder cannot object to marshaling. *Topcon Instrument Corp. of Am. v. West Coast Optical Instruments* (*In re West Coast Optical Instruments, Inc.*), 177 B.R. 720, 722-23 (M.D. Fla. 1992). In the circumstances of this case, I must therefore consider what effect the marshaling of Hennessey's interest in favor of Orix will have on Marcon and Bennett since all four parties have lien claims on Miller's assets.

A notice of sale filed at [DE 122] in the main bankruptcy case, shows that the following collateral of Miller has been sold for $200,000:

1)  1 - 1194 Kitamura Mycenter 3 CNC Milling machine w/4th axis, Fanuc OMC S/N: 20887 (for $40,000);

2)  1 - 1994 Kitamura Mycenter 3/APC CNC Milling machine w/4th axis, Fanuc OMC S/N: 20891 (for $40,000); and

3)  Mori-Seiki SL-153SY 5-axis lathe w/bar feed, Latham Hi-Pressure Pump, 4,000 rpm, 15 HP option, 9 Live Tools, Parts Catcher & Fanuc 181 Control S/N: 1424 (the "Lathe") (for $120,000).

-23-

Currently, these funds constitute the main asset of Miller by which these secured creditors can look to for satisfaction of their debt.[11]  I am aware that the Trustee has conducted further auctions of the Debtor's assets, which should change the amount of funds available for distribution to Hennessey, Orix, Marcon and Bennett, however, these additional sale proceeds should not dramatically change the financial landscape. Thus, my analysis will be based on what proceeds have currently been realized.

If I were to marshal the Debtor's assets as Orix requests, Hennessey would still be paid the full principal amount of the indebtedness owed to it of $112,912.99.  In collecting that amount, Hennessey would be required to look first to the $80,000 proceeds of the collateral other than those received from the sale of the Lathe, and Hennessey would be entitled to $32,912.99 in proceeds from the Lathe.  Orix would be entitled to receive the proceeds from the sale of the Lathe up to the full principal amount of the indebtedness owed to it, $126,648.83.  Since the balance of the Lathe sale proceeds after paying $32,912.99 to Hennessey is $87,087.01, Orix would be entitled to receive all of the additional proceeds.[12]  The effect of such a ruling would inevitably result in Marcon and Bennett receiving a zero dollar distribution.  I am less concerned about this result as it relates to Bennett.  Bennett's interest is subordinate to Marcon's interest and Bennett would receive no distribution from this asset sale whether I marshal or not.

If I were to marshal assets to the benefit of Orix, Marcon would be out of the money.  Since

---

[11]Despite an order which required that the entire $200,000 be escrowed pending a determination of this litigation, it appears that the Debtor invaded the funds to the extent of approximately $21,000.  Whether this amount can be recovered is an issue for the Trustee, or perhaps for Orix and Marcon.  See n12 below

[12]To the extent that the sale proceeds discussed in n11 are not recovered, Orix and Marcon's recovery would be *pro tanto* reduced.

Marcon has a lien on all of the Debtor's assets, such a result would be inequitable and unjust as it would unfairly deprive Marcon, which holds a lien on all of the Debtor's assets, of any participation in the sale proceeds. Under Pomeroy's analysis, Marcon is entitled to displace and defeat Orix's equitable right to marshal the sale proceeds. Therefore, I will deny Orix's request to marshal the Debtor's assets.

Without marshaling, I look to the proper allocation of the total sale proceeds of $200,000. Sixty percent of those proceeds resulted from the sale of the Lathe. I will therefore apportion the proceeds to the satisfaction of Hennessey's lien such that it will receive 60% of $112,912.99, or $67,747.79, from the sale of the Lathe and 40% of $112,912.99, or $45,165.20, from the sale of the other equipment. Orix will receive the balance of the sale of the Lathe, or $52,252.21. As Orix holds no lien against the other equipment, the balance of the proceeds from the sale of that equipment, or $34,834.80, will be paid to Marcon as the holder of the next senior lien. Bennett, whose lien is subordinate to the other three lienholders, will receive nothing from these sale proceeds.[13]

### CONCLUSION

Based on the foregoing I conclude that (a) Hennessey holds first priority over the Hennessey Collateral and is entitled to the first $112,912.99 from the proceeds of the sale described above, which will be allocated *pro rata* between the Lathe proceeds and the other proceeds; (b) Orix has a second priority interest in the Lathe and is entitled to the balance of the Lathe proceeds in the amount of $52,252.21; (c) Marcon holds a second priority interest in all of Miller's personal property, except as to the Lathe in which it holds a third priority interest, and is entitled to the

---

[13]If the sale of collateral were to generate enough proceeds to satisfy Marcon's claim, then Bennett would receive his *pro rata* share of the remaining proceeds.

balance of the sale proceeds from the non-Lathe collateral in the amount of $34,834.80; and (d)

Bennett holds a third priority interest in all of Miller's personal property, except as to the Lathe in

which it holds a fourth priority interest, and would be entitled to the balance of the sale proceeds

after payment in full of the other three secured creditors if there were such proceeds.  As there are

not, Bennett will receive nothing from the sale proceeds.

Accordingly, it is **ORDERED** that the Hennessey Motion and the Orix Motion are hereby

**GRANTED** to the extent set forth herein, and are otherwise **DENIED**, and the Bennett Motion is

hereby **DENIED.**

### 

Copies Furnished To:

Michael W Ullman, Esq.
150 E. Palmetto Park Rd #650
Boca Raton, FL 33432

Trey E. Miller, III, Esq.
5937 Taft St
Hollywood, FL 33021

David A Strauss, Esq.
25 SE 2 Ave # 730
Miami, FL 33131

Robert N Gilbert, Esq.
222 Lakeview Ave #1400
West Palm Beach, FL 33401

Kevin C Gleason, Esq.
4121 N 31 Ave
Hollywood, FL 33021

Bruce David Green, Esq.
1313 S Andrews Ave
Ft. Lauderdale, FL 33316

Phillip M. Hudson III, Esq.
200 S Biscayne Blvd Suite 3600
Miami, FL 33131

Mr. Gilbert is directed to serve a conformed copy of this Order on all interested parties not listed above.